In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-16-00022-CV
_____


IN THE INTEREST OF R.M.


On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 14-10-11283-CV


MEMORANDUM OPINION

After a bench trial, the trial court entered an order terminating the parental rights of L.B. to her child, R.M., a ten-year-old boy.[1] L.B. appeals the termination, raising two issues. We affirm.

---

[1] We use initials to protect the identity of the child. *See* Tex. R. App. P. 9.8. Other family members and witnesses are also identified, as necessary, with initials and designations based on their respective relationship with the child. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8.

PROCEDURAL BACKGROUND

On October 14, 2014, when R.M. was seven years old, the Department of Family and Protective Services (the Department) filed an "Original Petition for Protection of a Child, for Conservatorship, and for Termination in [a] Suit Affecting the Parent-Child Relationship" (the petition). In the petition, the Department requested that the trial court appoint the Department as R.M.'s temporary managing conservator because "allowing the child to remain in the home would be contrary to the child's welfare." The Department also requested that the trial court appoint the Department as R.M.'s permanent sole managing conservator if R.M. could not be reunified with either parent or permanently placed with a relative or other suitable person for placement, and that L.B.'s parental rights (and R.M.'s unknown father's rights) be terminated if reunification could not be achieved. The petition alleged the appointment of one of R.M.'s parents as permanent managing conservator would not be in R.M.'s best interest because it "would significantly impair the child's physical health or emotional development." The petition was supported by a sworn and notarized affidavit of a Department representative, wherein the representative described the circumstances necessitating removal.

According to the affidavit, the Department received a report on September 27, 2014, that seven-year-old R.M.[2] "was placed in a situation of immediate harm[]" when his mother, L.B., "was extremely intoxicated, and got into a physical altercation with a friend." The affidavit alleged that L.B. "was reported to have been taken to a hospital by EMS as a result of her level of intoxication." The representative of the Department explained in the affidavit that he met with L.B. at Conroe Regional Hospital on September 27, 2014, and she was "observed to be under the influence of an unknown substance[,]" would "change emotions extremely quickly," was "unable to carry a conversation as a result[,]" and was "contorting her body in an abnormal manner." The Department representative noted that the hospital staff reported that L.B. did not take a drug screening at that time. According to the affidavit, the Department representative made contact with a Montgomery County Sheriff's Deputy, who reported that he had been contacted about an altercation with L.B., that L.B. was heavily intoxicated under an unknown substance, and that L.B. had been taken to the hospital. The affidavit states that the Department secured placement for R.M. with a "family friend[,] [R.W.]"

The Department representative noted in the affidavit that he met with L.B. at her residence on September 28, 2014, and L.B. "was in a very agitated mood,"

---

[2] The affidavit stated that R.M. has Down syndrome.

3

"behaved in an erratic manner[,]" and spoke to the Department representative "for approximately five minutes prior to kicking [him] out of her home." The affidavit alleged that L.B. contacted the Department representative on October 1, 2014, and made arrangements to meet him at the local CPS office. At the meeting, L.B. denied being under the influence of drugs (with the exception of her prescription medications) on the night of the altercation and claimed that a friend had assaulted her. L.B. also denied any illegal drug use or mental illness, but reported past cocaine use and "side effects" from a motorcycle accident when she was a teenager. According to the affidavit, L.B. reported she went to the hospital as a result of the assault and not because she was intoxicated.

The Department representative noted in the affidavit that L.B. showed him prescriptions for "Lunesta which she takes to help her sleep, Quetiapine which she takes for Bi-Polar, Lamotrigine for mood disorder, Traz[o]done for sleep, Mirtazapine for depression, Hydroxyzine for anxiety, and Fluoxetine for depression[,]" but L.B. could not provide proof of prescriptions for the pain medication and muscle relaxers that L.B. had reported taking for neck and back pain. According to the affidavit, L.B. agreed to submit to a urinary analysis and hair follicle drug screening by October 3, 2014. On October 13, 2014, the Department representative received the results which showed L.B. tested negative

on the urinary analysis but tested positive for methamphetamines on her hair follicle. The Department representative noted that "[t]he biological father for [R.M.] is unknown at this time[,]" and the Department representative concluded, in part, the following:

> [L.B.] placed the child at risk of immediate harm from being heavily intoxicated by an unknown substance while caring for [R.M.]. [L.B.] tested positive for methamphetamines on a hair follicle drug screening. [L.B.] has had extensive CPS involvement . . . including multiple removals of her children. The prior CPS history has included cocaine use, and abuse o[f] prescription medications. It is believed to be in the best interest of the child, [R.M.], for the Department . . . to be granted Temporary Managing Conservatorship of [R.M.] . . .

The affidavit also listed L.B.'s CPS history, which included several allegations of neglectful supervision of her children dating back to 1989, as well as criminal convictions in 1999 for driving while license suspended and in 2005 for assault causing bodily injury to a family member.

After a show cause hearing on October 27, 2014, the trial court entered an order finding that allowing R.M. to remain in L.B.'s home would be contrary to R.M.'s welfare and that it would not be in R.M.'s best interest to appoint R.M.'s parents as managing conservators because it would significantly impair R.M.'s physical health or emotional development. The trial court named the Department as R.M.'s temporary managing conservator. The trial court ordered L.B. to comply with a Service Plan, which required her to, among other things, complete a

psychological evaluation, maintain employment, complete a drug and alcohol evaluation, complete parenting classes, participate in random drug testing, and attend individual counseling.

After a bench trial, the trial court signed a final order of termination on January 25, 2016, naming the Department as permanent managing conservator of R.M. and terminating L.B.'s parental rights to R.M. In addition to finding by clear and convincing evidence that termination of L.B.'s parental rights was in R.M.'s best interest, the trial court found by clear and convincing evidence that (1) L.B. had knowingly placed or knowingly allowed R.M. to remain in conditions or surroundings that endanger his physical or emotional well-being; (2) L.B. had engaged in conduct or knowingly placed R.M. with persons who engaged in conduct that endangers R.M.'s physical or emotional well-being; and (3) L.B. had her parent-child relationship terminated with respect to another child based on a finding that L.B.'s conduct was in violation of Paragraph (D) or (E) of section 161.001(b)(1) of the Texas Family Code or substantially equivalent provisions of the law of another state. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (M) and (b)(2) (West Supp. 2015).[3] L.B. appealed.

---

[3] Section 161.001 of the Texas Family Code was amended in 2015. *See* Act of Mar. 30, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001, 2015 Tex. Sess. Law Serv. 1, 18-20 (current version at Tex. Fam. Code Ann. § 161.001 (West

<u>Testimony of CPS Investigator</u>

A CPS Supervisor at the time of trial who was the CPS Investigator for R.M.'s case testified for the State. He testified that the Department received an intake on September 27, 2014, alleging neglectful supervision stemming from L.B.'s intoxication that night. According to the Investigator, L.B. got into a disagreement with a friend. The intake stated that L.B. went to a neighbor's house whom she did not know and L.B. was very intoxicated. The Investigator went to the hospital to talk to L.B. At trial, he described L.B. as "extremely intoxicated[,]" instantly changing "from subject to subject and topic to topic[,]" and that L.B. was "contorting her body in various ways that was not normal." According to the Investigator, he spoke to law enforcement earlier that night and "[t]hey indicated that [L.B.] was one of the most intoxicated people they had ever seen."

The Investigator, unable to continue conversing with L.B. due to L.B.'s condition, left the hospital and went to the neighbor's house where R.M. was at the

Supp. 2015)). Former subsections 161.001(1)(D), (E), and (M) are now designated as subsections 161.001(b)(1)(D), (b)(1)(E), and (b)(1)(M), and former subsection 161.001(2) is now designated as subsection 161.001(b)(2). Tex. Fam. Code Ann. § 161.001. The language contained within subsections (b)(1)(D), (E), and (M) remains the same as the former subsections, and the 2015 amendment does not affect the resolution of this appeal. *See id.* Therefore, we refer to the current version of the statute.

time, where the Investigator spoke with law enforcement. According to the Investigator, he asked L.B.'s mother if R.M. could stay with her for the night, but L.B.'s mother said no. R.W., a male friend of L.B.'s, arrived at the neighbor's house and, after the Investigator did a background check on R.W., R.M. spent the night with R.W.

On September 28, 2014, the Investigator made contact with L.B. at her house. According to the Investigator, L.B. "became agitated about halfway through the conversation[]" and wanted to speak to an attorney, and the Investigator ended the conversation. Thereafter, the Investigator interviewed L.B. on October 1, 2014. The Investigator testified that during the interview L.B. "denied being on any illegal substances[]" on the night of the incident, and L.B. stated that she had taken Lunesta, Trazodone, muscle relaxers, and Norcos that night. The Investigator explained at trial that he was unable to verify L.B.'s prescriptions for these medications. The Investigator testified that L.B. was fully cooperative with the interview and in signing the paperwork for the parental child safety placement. The Investigator testified that he requested that L.B. submit to a urinalysis and hair follicle test. According to the Investigator, the urinalysis was negative but the hair follicle test was positive for methamphetamines. As a result of the investigation, the Department sought removal of R.M. from L.B.'s care because the Department

8

concluded that R.M. would no longer be safe in L.B.'s care and "Family-Based Safety Services wouldn't be a pertinent enough procedure to do because . . . [R.M.] would not be safe returning to [L.B.'s] home."

Testimony of CPS Caseworker

The CPS Caseworker testified she had been R.M.'s caseworker since September 2014 and visits R.M. at least once a month. The Caseworker explained that when she first met R.M. he was not talking much, he was not able to answer questions or interact with people, and he was inactive.

The Caseworker explained that R.M. was initially placed with R.W. until February 2015. R.M. was initially placed with R.W., but there were problems identified by the Caseworker, including concerns about R.W.'s supervision and care of R.M., so the Department sought another placement. Around February or March of 2015, the goal in the case changed from family reunification to unrelated adoption, and R.M. was moved to his current placement.

According to the Caseworker, terminating L.B.'s parental rights to R.M. is in R.M.'s best interest because L.B. "has not shown throughout the life of the case that she's able to care for [R.M.] long term." The Caseworker explained that L.B., despite being asked to refrain from drinking alcohol because of her prior substance abuse, tested positive for high levels of alcohol twice in 2015. The Caseworker

testified that L.B. had mood swings and was unpredictable, did not want to follow the rules at her scheduled visits with R.M., was not compliant with her service plan, and did not demonstrate an ability to take care of R.M. The Caseworker testified that L.B. only understands R.M.'s special needs "to a certain extent[,]" and the Caseworker explained that, throughout the case, it became apparent that R.M. needs occupational and physical therapy and "things that he needed as far as like a brace in his shoes to help him walk correctly, all that was never addressed in the beginning." The Caseworker added that, if R.M. was allowed to go home with L.B., the Caseworker would be concerned about the kind of people R.M. would be around because one of L.B.'s friends that she brought to a visitation with R.M. was "on a run from . . . domestic violence[,]" was off her medication and had a baby with her, and her children were later removed as well. According to the Caseworker, L.B. had not made all the changes necessary to reduce the risk to R.M., L.B. could not care for R.M., and L.B. had not been honest about "dancing as a stripper[,]" the fact that L.B. tested positive for methamphetamines, and the fact that L.B.'s neighbor had given her methamphetamines.

The Caseworker testified that she had done everything in her power to help L.B. with her services and that it is in R.M.'s best interest to stay at his current placement. On cross-examination, the Caseworker agreed that L.B. had completed

10

the tasks on her service plan, but the Caseworker explained that L.B. was not compliant with her service plan because L.B. did not follow through with recommendations and because she did not abstain from drug and alcohol use as required.

The Caseworker testified she has no concerns about R.M.'s current placement. R.M.'s current caregivers understand where R.M. is developmentally, the school no longer calls regarding concerns about R.M.'s hygiene and is pleased with R.M.'s current placement and progress in his learning, R.M. is receiving occupational and speech therapy and attending doctor and dental visits, and R.M. is more active and makes friends.

Testimony of Dr. Stadler

Jenny Stadler, PhD., a licensed psychologist who contracts with the State to conduct psychological evaluations, testified for the State. According to Dr. Stadler, she conducted an "extensive" interview of L.B. and sent a report to the Department regarding Dr. Stadler's recommendations. Dr. Stadler explained that during that interview L.B. stated she had five children and had never been married. L.B. told Dr. Stadler that CPS became involved after L.B. had been experiencing back pain, had taken some unprescribed medication that caused her to hallucinate, was also taking a large number of other medications, and had "an incident with some other

11

individuals and [R.M.] was present." L.B. reported to Dr. Stadler that L.B. only consumed alcohol on social occasions and that she had used cocaine from age nineteen to twenty-nine, but L.B. denied any use of methamphetamine. L.B. told Dr. Stadler that L.B. had been diagnosed with bipolar disorder, but Stadler explained at trial that she questioned that diagnosis because L.B. informed her that L.B. had "a history of head injury, brain injury," and the symptoms L.B. reported on the personality assessment inventory "seemed to be much more consistent with the traumatic brain injury rather than the bipolar disorder." At the time of the interview, L.B. was taking Lunesta for difficulty sleeping and Klonopin for anxiety.

Dr. Stadler testified that the testing she conducted during the interview indicated there were risks regarding the Department's goal of family reunification, such as L.B.'s memory impairment. According to Stadler, memory impairment could be a problem if R.M. were returned to L.B. because it would make it hard for her to learn new skills. Dr. Stadler further explained that, even if L.B. completed services, her memory impairment, along with her symptoms of "impulsivity, distractibility, impulse-control difficulty, rigidity, [and] anxiety[,]" would raise an issue of whether she could benefit from the services. Dr. Stadler testified that in parenting, impulsivity can create a safety risk because an impulsive parent "might

12

impulsively strike a child if [she] didn't have a lot of . . . the controls that would make [her] stop doing something like that." Stadler characterized "rigidity" as a difficulty in "shift[ing] from one way of approaching something to another." Dr. Stadler also testified that L.B. has "labile mood[,]" which can also be a risk because quick shifts in mood could cause impulsive behavior and that L.B. has a tendency towards confabulation and to remember things that did not occur. According to Dr. Stadler, the ability to be non-rigid in one's thinking would be particularly helpful for parenting a child with Down syndrome "because children with Down syndrome can be rigid by themselves, so it would just be helpful to have a parent with a little more flex." Dr. Stadler also identified as a risk factor the fact that L.B. does not have much social support in that she "tends to rely on her psychiatrist . . . and maybe one close friend."

Dr. Stadler testified that L.B.'s child abuse inventory and adult adolescent parenting inventory "both raised red flags." As for the child abuse inventory, Dr. Stadler testified that the test results were "consistent with parents who are abusers[]" and that the adult adolescent parenting inventory indicated that L.B.'s "parenting knowledge was very low." According to Stadler, L.B. has inappropriate expectations, which means she does not completely understand a child's normal developmental capabilities, she has a low level of empathy, and she has "a hard

13

time engaging in the parental role[,]" which Stadler explained is highly unusual for a parent of L.B.'s age and who has completed a parenting course. Dr. Stadler also noted that L.B. "presented in a defensive fashion when she completed [the] inventory[,]" which means "she tended to probably under-report symptoms[]" and could "be a little more reluctant to engage in services." Dr. Stadler testified that her report noted that L.B.'s "thought process was circumstantial and distractible, thought content included mild paranoid ideation and a tendency towards grandiosity." Dr. Stadler described "grandiosity" as "a tendency to talk about yourself in a way that's extremely positive and possibly a little unrealistic." Dr. Stadler explained that a child will generally model a parent's behavior and if a parent tends to exhibit paranoia or anxiety, the child of that parent "can pick up those behaviors[.]" In Dr. Stadler's opinion, L.B. had a traumatic childhood and has not processed what she experienced as a child in order not to reenact those behaviors as an adult, which affects L.B.'s ability to parent successfully. Dr. Stadler testified that she was concerned about the stability of L.B.'s close personal relationships and that L.B. has a "somewhat below average" interest in and motivation for treatment.

Dr. Stadler testified that she made recommendations for L.B. in light of the goal of family reunification: to participate in individual therapy to address anxiety

14

and parent education to "cover things a little bit better" since L.B. had already completed a parenting course, to develop a better social support network to help her in raising her disabled son, to consult with a psychiatrist concerning medication for her brain injury, and to participate in family therapy.

<u>Testimony of B.S.</u>

B.S. also testified at the trial. B.S. was the caregiver with whom R.M. was placed at the time of trial. B.S. agreed that he had a lot of experience in dealing with special-needs children. B.S. explained that R.M. had been with B.S. and his wife, R.S., for six or eight months and R.M. "fit in to the family" that included other special needs children. B.S. stated at trial that when R.M. first came into their care, R.M. had trouble bathing himself, had poor eating habits and diet, and wanted to watch television a lot. B.S. testified that while in their care R.M. has "made a tremendous amount of progress" in his therapies and has "excelled quite a bit faster than other kids that [he had] seen." B.S. testified that R.M. was hard to understand when he first came into their care, but that at the time of trial R.M.'s vocabulary had expanded, he was talkative, and he was recently able to sing on stage in a church production. B.S. explained that he plays sports with R.M. in the backyard and that R.M. enjoys being outside. B.S. testified that R.M. interacts well with the other children at home and "he just fits in." B.S. believed that, based on R.M.'s

15

behavior, R.M. was exposed to family violence prior to coming into their care, and R.M. did not have a lot of experience outdoors. B.S. explained that it was his and his wife's goal to adopt R.M., and that B.S. already considers R.M. his son and loves him.

Testimony of R.S.

R.S. testified that she and her husband have three other Down syndrome children in their home, and that she has attended many classes or seminars on how to care for children with special needs and Down syndrome. R.S. explained that R.M. fits in "[v]ery well[]" at their home. According to R.S., R.M. receives speech, occupational, and physical therapy at home and also receives occupational therapy at school. R.S. testified that R.M. is progressing with his therapy and is thriving at school. R.S. explained that R.M. has not demonstrated any separation anxiety since his separation from L.B. and he does not mention L.B. or have any reaction after he leaves his visits with L.B. R.S. describes R.M. as "a good boy[]" who is happy and comes home from school excited to see everyone at their house. R.S. explained that R.M. is healthy but needs constant supervision because "he's delayed in areas and he doesn't have cognitive immediate forethought for things. . . . he needs constant supervision and a safe environment because he also will not be able to outcry for himself to get help and things like that because he's not going to

16

understand it's wrong." R.S. testified that R.M. is "going to need meals prepared for him forever[]" and that he will "have to have someone to help him with shopping and keeping him safe or knowing right from wrong." R.S. has adopted other Down syndrome children and understands the lifetime commitment she will be making to R.M. if they are able to adopt him, and she intends on caring for R.M. even after he turns eighteen. According to R.S., she has bonded with R.M. and loves him.

Testimony of K.T.

K.T. testified that she taught R.M. from 2013 through the 2015 school year which was essentially the first and second grade. K.T. testified that prior to R.M. being removed from L.B. by CPS, K.T. had concerns about R.M.'s well-being. According to K.T., R.M. was demonstrating inappropriate behavior at school, was aggressive and emotionally unstable, acted out sexually, and had poor hygiene and would smell of urine. K.T. explained that R.M. was unable to communicate well in first grade but was able to communicate his wants and needs. K.T. testified that she taught R.M. life skills such as how to use the restroom, make sandwiches, dress himself, have good hygiene, and stay safe in the community.

K.T. testified that R.M. would come to school wanting two or three breakfasts. When he would arrive at school dirty, K.T. would take him to the

17

nurse's office to get cleaned up or have his hair washed. According to K.T., R.M. had a folder with R.M.'s daily work in which K.T. would make a note when she had to address hygiene issues, and although parents were expected to initial the folder daily, L.B. was not compliant. K.T. testified that L.B. attended meetings with the teacher at the school but that some meetings had to be rescheduled because L.B. did not show up or she cancelled. K.T. testified that on one occasion, when R.M. was in first grade, L.B. came to a meeting at the school, and it appeared L.B. was under the influence of a substance. The principal called law enforcement, and L.B. was arrested upon leaving the school grounds. K.T. stated that when R.M. was in second grade, K.T. observed L.B. slurring her speech and talking in incomplete sentences at one school meeting.

K.T. explained that R.M. was probably absent at least fifty-five percent of the school days in the first grade and the "school pressed charges with as many days as he missed." According to K.T., when R.M. was placed with R.W. in 2014, R.M. still had poor hygiene and aggressive behaviors, did not make educational progress, and R.W. would return the folder without initialing it or L.B. would initial the folder even though she was not supposed to be with R.M.

K.T. testified that since February 2015, when R.M. was placed with his current caregivers, B.S. and R.S., R.M. "has advanced tremendously[]" and is

18

thriving. According to K.T., the last time R.M. was in her class and when he was placed in his current placement, he was no longer acting inappropriately. Although she was not R.M.'s teacher at the time of trial, she had talked to his teacher and the current teacher told K.T. that R.M. is "doing great. He's completing assignments. He's happy. He's not as hungry. I don't think he's ever missed a day of school this year." K.T. explained that she is excited for R.M., and that he is showing great progress in a short period of time as a result of his therapies and because things that are being worked on at school are being reinforced at home.

Testimony of K.E.

K.E., the nurse at R.M.'s elementary school testified. She has known R.M. since 2010 and she has been the nurse at R.M.'s school while R.M. was in pre-kindergarten through third grade. K.E. explained that R.M. had problems with hygiene up until the year before trial. According to K.E., she communicated with L.B. about the hygiene issues, but K.E. continued to have to help clean R.M., cut his fingernails and toenails, and wash his clothes and shoes. Prior to his current placement, R.M. had displayed aggressive behaviors and missed a lot of school, and K.E. was concerned whether R.M. was getting enough to eat and if he was safe. K.E. testified that since his current placement, R.M.'s attendance has improved, R.M. no longer has hygiene issues at school, and R.M. does not exhibit

behavioral problems. K.E. did not believe that L.B. or R.W. made sure R.M.'s needs were met, and K.E. believes R.M.'s needs are being met in his current placement and that he is receiving services he has never before received.

Testimony of Court-Appointed Special Advocate

The Court-Appointed Special Advocate (the CASA) appointed for the case testified that she has taught special education children for more than fifteen years. The CASA explained that at a meeting with school personnel it was reported to the CASA that, prior to R.M.'s current placement, R.M. had not been consistently attending school or would be tardy, which would result in R.M. regressing and not getting the consistent schedule that he needs. The CASA explained at trial that at visits R.M. seemed happy to see L.B., but he showed no separation anxiety when the visits were over.

The CASA expressed concern for R.M.'s safety if he was to be returned to L.B.'s care because L.B. struggles to take care of herself, the CASA is not sure that L.B. would put R.M.'s needs above her needs, and she questions L.B.'s discernment as to her choice of friends, considering that special needs children have an increased risk of abuse and are not always able to report it. The CASA had concerns about L.B.'s alcohol consumption because, considering L.B.'s history of addiction, if L.B. was intoxicated she "might make poor decisions[.]" The CASA

20

testified that L.B. lacked custody of her other children and that L.B. "was not able to take care of any of her previous children past [the age of] four or five[.]"The CASA explained that R.M.'s caregiver will have to make a lifetime commitment to R.M. and to R.M.'s care and that the CASA worries about meeting R.M.'s needs as he becomes an adolescent, and about medical issues that commonly arise with persons with Down syndrome as they age. The CASA stated that she was concerned that if R.M. was returned to L.B.'s care that L.B. could not "stay on top of" R.M.'s needs while being a single mom with very little support at home.

The CASA testified that there has been a "big difference[]" in R.M.'s progress since the CASA was assigned to the case in October 2014 and that R.M. participates and engages more in conversations. According to the CASA, R.M. is thriving in his current placement and she has no concerns with his current placement. The CASA testified that she believed the best place for R.M. "to reach, not only the greatest potential that he can reach but also for his safety and security[]" is with his current placement, and that his placement with B.S. and R.S. should be permanent.

L.B.'s Testimony

L.B., R.M.'s mother, testified that the identity of R.M.'s father is unknown. According to L.B., she has five children, none of them live with her, and she has

already had her parental rights terminated as to two of the children. An order terminating her parental rights as to one of her children was admitted into evidence. L.B. explained at trial that R.M. had briefly been in CPS custody when R.M. was an infant after a report to CPS that L.B. was not taking care of R.M. According to L.B., CPS in Montgomery County also removed R.M. briefly in 2009 or 2010 when marijuana was found in L.B.'s house.

L.B. testified that she suffered a head injury in a motorcycle accident when she was seventeen. According to L.B., she also had a back injury when she was thirty-four. L.B. testified that she has rented her home for almost three years and does bookkeeping, shopping, and cleaning for a construction company, and on occasion, works during the day as a hostess and dancer at a gentleman's club where she has worked for fifteen years. L.B. testified that someone stole her identity, which makes it hard for her to find employment. During her counseling, L.B. told her counselor that she was having physical disability issues that made dancing difficult and that she planned on starting classes to earn a certificate to be a chemical dependency counselor. L.B. acknowledged that she had served jail time for a conviction for assaulting her boyfriend thirteen years ago and that she has been involved with CPS more than three times.

L.B. explained that just prior to R.M.'s removal, she had neck surgery and she was prescribed Percocet and Soma. According to L.B., R.M. is in the Department's custody because L.B. took medication prescribed to her after surgery and those medications interacted with her regularly prescribed medications and caused her to black out. She testified that when she blacked out, someone came into the house and offered her something to wake her up. L.B. said that after she took it she "started feeling really weird" and walked two doors down with R.M. and called 9-1-1. L.B. said she did not realize that the person had handed her meth, and that it was the only occasion she had tried methamphetamine. L.B. testified that she was already taking Trazodone and Lunesta to help her sleep, Klonopin for her bipolar and anxiety, Prozac for depression, Effexor for seizures, and Lorazepam and some other medications that she could not identify.

L.B. testified that she is "not a drinker[,]" has never drunk alcohol while taking any medications, and the last alcoholic beverage she had was about a month before trial. According to L.B., she received treatment at Santa Maria and has been sober from crack for fifteen years. She acknowledged at trial, however, that she had tested positive twice for alcohol during the pendency of the case. She stated that she had received her one-month sobriety chip from "NA/AA[.]" L.B. testified that she complied with her service plan and participated in counseling, completed

an alcohol and drug assessment, and maintained a home and employment. Photographs of L.B. with R.M. and of her home were admitted into evidence. According to L.B., R.M. has never seen her do drugs and the only time he saw her impaired was the time of the last removal when she was impaired "on the medication[]" but not on "meth[.]" L.B. explained she is no longer taking any narcotic medications and that the Department has not given her a fair opportunity to get her son back.

L.B. agreed that due to his special needs, R.M. needs to keep a routine, stay on schedule, make it to school every day, have more interaction with people, and have a sober parent. L.B. testified that when she or R.W. cared for R.M. that R.M. went to school clean, dressed, and fed. She explained that she attended meetings with R.M.'s teachers and that R.M.'s teachers never informed her that R.M. was coming to school with improper hygiene and the only time she was notified that he was not clean was when his notebook included a notation that he had gone to the bathroom in his pants. L.B. explained that, prior to R.M.'s removal, there was a six-week period when R.M. missed a lot of school because R.M. was sick and seeing multiple doctors, and that L.B. was in constant communication with the school district regarding the absences and received his assignments from the district.

According to L.B., she reported to the Department that R.M. smelled like urine and had bug bites and marks on his arm at visits, and she believed he was being abused in his current placement. Photographs L.B. stated that she took of R.M.'s arm at a visit were admitted into evidence. She also testified that she believes R.M. has regressed while in the Department's care and that R.M. is not talking more than he was before. She testified she believes she is a good example for R.M. and she wants L.M. to be just like her. She explained that she is ready to have R.M. back and that he "was not doing well now like he would if he was with me."

Testimony of R.W.

R.W. testified that he met L.B. about six years prior to trial. R.W. testified that he has twin grandsons the same age as R.M. and that R.M. had stayed at his house prior to September 27, 2014. He saw L.B. and R.M. interact "a couple of times a week, maybe every other weekend[]" prior to the CPS case. R.W. said he never saw anything out of the ordinary with R.M. and L.B., described L.B. as an "[e]xcellent mother[,]" and testified that he had no concerns about R.M. being returned to L.B.'s care. R.W. explained that he never saw L.B. have more than one drink and he never saw L.B. use illegal drugs. R.W. testified that L.B.'s behavior on the night of September 27, 2014, was out of the ordinary for L.B. R.W.

25

explained that on that night CPS called him and asked if he could pick up R.M. R.W. testified that R.M. stayed with him for the next four-and-a-half months. According to R.W., during this period R.M. would attend daycare before and after school. When asked if he ever received any reports from the school regarding R.M.'s hygiene and care, R.W. responded, "a lot of times I didn't know what was going on. But yeah, I did one time, which I had questioned. When I got that one, I questioned the daycare worker because [R.M.] never went to school dirty." According to R.W., R.M. would take a bath almost every night and would skip taking a bath "maybe once every two weeks." R.W. testified that the daycare and school never expressed concerns about R.M.'s hygiene and he agreed that it would surprise him if there were reports from the school of occasions when R.M.'s clothes were so dirty they had to clean R.M. at school. R.W. denied ever sending R.M. to school with soiled underwear, but R.W. explained that at times R.M. would soil his underwear at school and come home in different clothes.

Testimony of B.N.

B.N. testified for L.B. B.N. explained that he lives out of town and met L.B. about thirteen years ago at a club. According to B.N., he and L.B. had an intimate relationship about twelve years ago but have remained friends. L.B. introduced B.N. to B.N.'s current wife, S.N. "[O]n a fairly regular basis[,]" when they lived

26

closer and after R.M. was first born, B.N. and S.N. would visit L.B. and R.M. B.N. testified that he saw L.B. and R.M. interact when R.M. was about three years old and that he did not have any concerns about L.B. as a parent. He never saw L.B. use illegal drugs and said that "[o]n occasion she might take a drink[.]" B.N. explained that the last time B.N. saw R.M. was "four or five years" prior to trial and that he knew "[a] little bit[]" about the CPS case. He testified that in his opinion it would be out of character for L.B. to mix illegal drugs and prescription medications and cause her to black out; and, B.N. said that it would surprise him if those allegations had been made against L.B. According to B.N., he has talked to L.B. once every two or three months over the last several years and he was unaware of how many times R.M. has been in CPS care. B.N. has talked to L.B. during the pendency of the case and L.B. has told him that she misses R.M.

Testimony of S.N.

S.N., B.N.'s wife, testified that she used to come to L.B.'s house and babysit R.M. for two to three weeks "every couple of months" and last saw him at least a year before trial. She testified that she never was concerned regarding the way L.B. cared for or interacted with R.M. and that L.B. "took very good care" of him. S.N. testified that she never knew L.B. to use drugs or abuse prescription medications and that L.B. "wouldn't drink because she doesn't like beer [and] doesn't like any

27

kind of liquor." According to S.N., L.B. told her that R.M. was in the Department's care because after L.B. had neck surgery and the doctor prescribed medicine that reacted badly with her other medications and "she kind of had a blackout."

Testimony of J.O.

J.O. testified that he has known L.B. for about ten years, that L.B. used to come and visit with friends at his home, and that she would bring R.M. with her. J.O. testified he assumed L.B. drank alcohol because her friends did, but he never saw her drinking. J.O. acknowledged that L.B. worked as a dancer and when asked whether he thought it was a good idea for L.B. as a recovering addict to work at a place serving alcohol he testified that "she's strong enough to handle it." He last saw L.B. and R.M. together about a year before the trial. He explained he never had any concerns about how L.B. and R.M. interacted and he had no knowledge about L.B.'s prior CPS history or about the details of this case.

ISSUES ON APPEAL

L.B. raised two issues on appeal. In her first issue, L.B. asserts that her trial counsel rendered ineffective assistance. In her second issue, she argues the evidence was insufficient (1) to support the termination of her parental rights to R.M. under statutory grounds for termination, and (2) prove that terminating her rights to R.M. is in R.M.'s best interest.

28

INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

In her first issue, L.B. contends her trial counsel rendered ineffective assistance of counsel. An indigent parent who is appointed counsel has a right to the effective assistance. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003) (interpreting Tex. Fam. Code Ann. § 107.013(a)(1) (West Supp. 2015)). The standard for determining claims of ineffective assistance is the two-prong analysis adopted by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Under the first prong of *Strickland*, L.B. must show that her counsel's performance was deficient. *See id.* at 545 (quoting *Strickland*, 466 U.S. at 687). When examining the performance of counsel, we focus on whether counsel performed in a "reasonably effective manner." *Id.* Counsel's performance falls below acceptable levels of performance "when the 'representation is so grossly deficient as to render proceedings fundamentally unfair[.]'" *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim. App. 1983)). We give deference to counsel's performance, and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 681, 689. Under the second prong of the *Strickland* test, L.B. must establish that her counsel's deficient performance caused harm. *See M.S.*, 115 S.W.3d at

549-50. Harm is established by showing that "'there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.'" *See id.* at 550 (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). In making an ineffective assistance of counsel allegation in a termination case, the allegation must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 622-23 (Tex. App.— Houston [1st Dist.] 2009, pet denied). When the record is silent as to the reasons for trial counsel's conduct and strategies, we will not speculate to find counsel's representation ineffective. *P.W. v. Dep't of Family & Protective Servs.*, 403 S.W.3d 471, 476 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.); *Walker*, 312 S.W.3d at 623.

L.B. argues that her counsel's assistance was deficient in the following respects: counsel allowed the Department's expert to testify "even though [L.B.'s counsel] was only notified of [the expert] in [a] disclosure two weeks before trial[]"; counsel failed to offer into evidence certain communications with parties recorded by L.B. that would impeach or bolster trial testimony; counsel failed to introduce L.B.'s records for R.M.'s absences/illnesses; counsel failed to obtain R.M's occupational therapy records; and counsel failed to object to certain

30

evidence, testimony, and arguments. L.B. did not file a motion for new trial, and her trial counsel has not been afforded the opportunity to respond to the allegations of ineffective assistance. Therefore, the record before this Court is silent as to trial counsel's strategy regarding the challenged conduct. "If the reasons for counsel's conduct at trial do not appear in the record and it is at least possible that the conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *In re K.L.A.C.*, No. 14-08-00960-CV, 2010 Tex. App. LEXIS 354, at \*18 (Tex. App.—Houston [14th Dist.] Jan. 21, 2010, no pet.) (mem. op.). In such circumstances, to warrant a reversal, "the challenged conduct must be 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Roberts v. State*, 220 S.W.3d 521, 533-34 (Tex. Crim. App. 2007)). "[T]hat counsel could have provided a better defense is not a legal basis for finding counsel constitutionally deficient." *Id.* (citing *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002)).

According to the record, L.B.'s counsel objected to Dr. Stadler's testimony on the basis that Dr. Stadler "was not disclosed to us in request for disclosure." From the discussion on the record, it appears that the disclosures were amended, but the record is unclear as to when the State first disclosed Dr. Stadler as a

31

witness. Furthermore, once the State provided information in response to the objection, L.B.'s counsel withdrew the objection. Counsel's withdrawal of the objection could have been strategic and L.B. has not shown that counsel's actions in withdrawing the objection were deficient or that the outcome of the trial would have been different if counsel had not withdrawn the objection and the objection had been sustained by the trial court. *See M.S.*, 115 S.W.3d at 545-46. As for the alleged audio recordings and attendance/illness records in L.B.'s possession, even if admissible, the appellate record does not reflect counsel's reasons for not offering the items into evidence and we therefore must presume his actions were sound trial strategy. *See P.W.*, 403 S.W.3d at 476. Additionally, L.B. has not shown that such conduct, if deficient, caused her harm. *See id.* With respect to counsel's alleged failure to object to certain evidence and testimony, L.B. has not demonstrated that her counsel's actions were deficient or harmed her case or deprived her of a fair trial. *See M.S.*, 115 S.W.3d at 545-46. Issue one is overruled.

SUFFICIENCY CHALLENGE

In her second issue, L.B. argues that the evidence was insufficient to support the "grounds for termination" found by the trial court, and that the evidence was insufficient to support the trial court's finding that termination of L.B.'s parental rights was in R.M.'s best interest. Specifically L.B. argues the evidence was

32

insufficient to support the trial court's finding by clear and convincing evidence that L.B. knowingly placed or knowingly allowed R.M. to remain in conditions or surroundings that endanger his physical or emotional well-being or that L.B. engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers R.M.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (b)(1)(E). Although on appeal L.B. challenges the sufficiency of the evidence under subsections (D) and (E), she does not specifically state how the evidence is insufficient to support the trial court's finding under section 161.001(b)(1)(M). *See id.* § 161.001(b)(1)(M).

Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, parental rights can be terminated upon proof by clear and convincing evidence that the parent has committed an act prohibited by section 161.001(b)(1) of the Family Code, and termination is in the best interest of the child. *See id.* § 161.001(b)(1), (b)(2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the

33

allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014).

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344-45 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of

the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109 (citing *J.L.*, 163 S.W.3d at 86-87).

<u>Statutory Grounds for Termination</u>

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interests. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re S.F.*, 32 S.W.3d 318, 320 (Tex. App.—San Antonio 2000, no pet.). Therefore, we affirm the termination order if the evidence sufficiently establishes any statutory ground upon which the trial court relied in terminating parental rights and if the evidence sufficiently supports the best interest finding. *See In re A.V.*, 113 S.W.3d at 362. Even if we liberally construe L.B.'s brief challenging the sufficiency of the evidence supporting the "grounds for termination" to include a challenge to the trial court's finding under section 161.001(b)(1)(M), we conclude that sufficient evidence supports the trial court's ruling under section 161.001(b)(1)(M).

The trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has had the parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of subsections (D) or (E) and termination is

35

in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(M), (b)(2). At trial, a "Final Order Modifying Prior Order and Decree for Termination" was admitted into evidence without objection. The final order terminated L.B.'s parental rights as to her child, W.J., based on the trial court's findings by clear and convincing evidence that L.B.'s conduct was in violation of subsections (D) and (E) and that termination of L.B.'s parental rights was in the child's best interest. At trial, L.B. agreed that her parental rights had been terminated as to her son, W.J. There was uncontroverted evidence that L.B.'s parental rights to another child had been terminated on a finding that L.B.'s conduct had violated ground (D) and (E).

Best Interests of the Child

The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry of whether termination of parental rights is in the best interest of the child: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child

36

relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307 (West Supp. 2015). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). A trial court's best interest finding "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm[,]" but rather it "is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013).

In this case, the record allowed the trial court to reasonably credit the testimony showing that B.S. and R.S. had provided and would continue to provide R.M. with a safe and stable home where R.M. is loved and receives the support and services needed to thrive, and that R.M.'s current caregivers have agreed to adopt him. *See* Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best

interest."). The trial court heard testimony that L.B.'s other four children were not in her care and that her parental rights as to two of those children had been terminated. The trial court heard testimony from witnesses such as Dr. Stadler, R.M.'s past teacher, R.M.'s school nurse, and the CASA, all of whom testified that R.M. remaining in his current placement was in R.M.'s best interest. Given L.B.'s failure to provide a safe and stable environment for R.M. and to ensure R.M. was properly fed, clean, and receiving proper services, together with her lack of "parenting knowledge[,]" the trial court was presented with clear and convincing evidence that termination of L.B.'s parental rights was in R.M.'s best interest. *See, e.g., In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A parent's inability to provide adequate care for her children, unstable lifestyle, . . . lack of parenting skills, and poor judgment may be considered when looking at the children's best interest."); *see also In re J.F.C.*, 96 S.W.3d at 266; *Toliver v. Tex. Dep't of Family and Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Having considered the *Holley* factors and the evidence the trial court had before it, we conclude the trial court's best-interest finding is supported by legally and factually sufficient evidence.

Because sufficient evidence supports the trial court's ruling under subsection 161.001(b)(1)(M), we need not address the arguments that L.B. raises concerning

38

the trial court's findings under subsections 161.001(b)(1)(D) and 161.001(b)(1)(E). *In re A.V.*, 113 S.W.3d at 362; *see also* Tex. R. App. P. 47.1. We overrule L.B.'s second issue.

The trial court's judgment is affirmed.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 31, 2016
Opinion Delivered June 30, 2016

Before McKeithen, C.J., Kreger and Johnson, JJ.